DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

STATE OF FLORIDA,

Appellant,

v.

STEPHEN L. FORD,

Appellee.

No. 2D2025-0324

_____

July 10, 2026

Appeal from the Circuit Court for Manatee County; Stephen M. Whyte,
Judge.

James Uthmeier, Attorney General, Tallahassee, and Sonia C. Lawson,
Assistant Attorney General, Tampa, for Appellee.

Blair Allen, Public Defender, and Tosha Cohen, Assistant Public
Defender, Bartow, for Appellant.


SMITH, Judge.

The State appeals the trial court's order granting Stephen Ford's
motion to suppress evidence obtained during a warrantless search of his
residence. Because the totality of the circumstances did not establish
that the detectives had an objectively reasonable belief of the existence of
exigent circumstances, the warrantless search of Mr. Ford's residence
was unjustified; we affirm the trial court's order granting Mr. Ford's
motion to suppress.

After an evidentiary hearing during which the trial court heard the testimony of the detectives who participated in the warrantless search of Mr. Ford's residence, the trial court found that the State failed to demonstrate that exigent circumstances existed justifying the warrantless search and determined that the officers' conclusions that life-saving care was needed were based on "a hunch or a guess or a speculation." The trial court noted that none of the detectives testified that they looked into Mr. Ford's windows "to see if there was, in fact, an emergency." Moreover, the court found that the detectives would have had plenty of time to obtain a search warrant and that the way they entered the house and conducted the search "belies the fact that there was any sort of exigency."

We defer "to the trial court on the factual issues but consider the constitutional issues de novo." *Seibert v. State,* 923 So. 2d 460, 468 (Fla. 2006).

"A warrantless search of a home is 'per se unreasonable under the Fourth Amendment . . . and Article I, section 12, of the Florida Constitution, subject to a few specifically established and well-delineated exceptions.' " *State v. Fultz,* 189 So. 3d 155, 158 (Fla. 2d DCA 2016) (quoting *State v. Boyd,* 615 So. 2d 786, 788 (Fla. 2d DCA 1993)). "Exigent circumstances are one such exception that may justify a warrantless search, but the police must have an objectively reasonable basis to support their actions." *Id.* (quoting *Vanslyke v. State,* 936 So. 2d 1218, 1221-22 (Fla. 2d DCA 2006)). "Whether sufficient exigent circumstances exist is evaluated based on the totality of the circumstances." *Seibert,* 923 So. 2d at 468-69 (citing *Zeigler v. State,* 402 So. 2d 365, 371 (Fla. 1981)). "The exigent circumstances exception is not a shortcut by which police may circumvent the requirement of a

search warrant." *Fultz*, 276 So. 3d at 158, 160 (stating that the officers did not have an objectively reasonable belief that immediate assistance was needed where they were presented with no concerns that anyone was in distress or possible evidence of criminal activity); *see also Wheeler v. State*, 956 So. 2d 517, 521 (Fla. 2d DCA 2007) (stating that the responding officers to a battery report "did not have a reasonable basis to believe that a grave emergency existed" where they saw nothing "suspicious about the residence itself" nor testified "that there was any indication from inside the residence that someone within was in need of their assistance").

It is improper for an appellate court to reweigh the evidence as does the dissent; we must limit our review of the record to determine if it contains competent and substantial evidence to support the conclusions of the trier of fact. *See Star Island Assocs. v. Lichter*, 473 So. 2d 791, 792 (Fla. 2d DCA 1985). And because competent substantial evidence supported the trial court's findings, and it properly determined that the detectives had no objectively reasonable belief in the existence of exigent circumstances that would justify the warrantless search of Mr. Ford's residence, we affirm.

KHOUZAM, J., Concurs.
ATKINSON, J., Dissents with opinion.

ATKINSON, Judge, Dissenting.

The State appeals an order granting Stephen L. Ford's motion to suppress evidence and statements obtained during a warrantless search that occurred on December 24, 1996. The relevant record evidence supports the State's argument that the warrantless search of Mr. Ford's

3

residence was based on an objectively reasonable belief that a welfare check was necessary. As such, I respectfully dissent.

## Background

Mr. Ford was charged with murder on August 20, 2024, and the crime was alleged to have occurred between December 7, 1996, and December 9, 1996—nearly twenty-eight years prior to the filing of the felony information. The victim had been reported missing by her daughter on December 11, 1996. Although the victim's body had been found floating in a drainage canal on December 15, 1996, she remained unidentified until May 22, 1997, when she was positively identified via dental records. Accordingly, the victim's disappearance was initially treated as a missing person investigation.

On December 20th, Mr. Ford consented to a search of his home—which he shared with the victim—and his truck. On December 22, 1996, Mr. Ford's home was searched for the second time with his consent. This search led to the discovery of a handwritten letter stating that Mr. Ford wanted to be with the victim if she was dead. Mr. Ford was at the police station being interviewed while his home was being searched, and during the interview the officers "confront[ed] Mr. Ford with things that were being discovered at the house," including the letter. According to Detective Noodwang, the letter caused him "concern for [Mr. Ford's] mental health," although he later testified that the letter was "just one small part" of his concern regarding Mr. Ford's mindset. Detective Noodwang recalled that during this six-and-a-half-hour interview, Mr. Ford "would go up and down" emotionally, and that, "[w]ith the totality of what [Detective Noodwang] had at that time," he was "concerned that [Mr. Ford] was going to commit suicide." Mr. Ford was "making statements that if a person that did this was proven guilty, then they

4

should die.  He said if he did it, then he should die also."  However, Detective Noodwang later testified that he felt that "a lot of it was faking," and that "a lot of it [he] didn't think was real."

The detectives dropped Mr. Ford off at his home following the lengthy interview, in the early morning hours of December 23, 1996. Detective Aspinall testified that Mr. Ford's "demeanor was not good when we dropped him off," and that his next contact with Mr. Ford was not until the 24th.  Detective Noodwang testified that he spoke to Mr. Ford *again* on the 23rd, when Detective Noodwang "met with the victim's daughter to get some property."  During this encounter on the 23rd, with the victim's daughter present, Detective Noodwang recounted that he "did not believe that [Mr. Ford] was so depressed or so suicidal to have a concern."

The warrantless search that is the subject of the motion to suppress occurred the following day on December 24, 1996.  On December 24, Detective Aspinall returned to Mr. Ford's residence along with Detective Babb, to continue investigating and to "see how he was." Detective Aspinall could not recall if Detective Noodwang was present on the 24th, whereas Detective Noodwang testified that he met Detective Aspinall and Detective Babb at Mr. Ford's home "on [his] way into work in the morning."  They did not have a search warrant to enter the house. The detectives knocked on the doors and the windows, but Mr. Ford did not respond.  The members of the surveillance unit that were watching Mr. Ford's residence confirmed that they had never seen Mr. Ford leave, and his vehicle was still present outside.  The detectives did not try to call Mr. Ford because during a previous interview Mr. Ford had informed them that he had disconnected his phone.  Detective Noodwang testified that, having been "banging on the door" without a response, "we decided

5

that we needed to do more of a welfare check and get inside that house to check on him." Similarly, Detective Aspinall testified that they "wanted to make sure everything was all right," citing concerns about Mr. Ford's "demeanor from when we dropped him off the night before." Because they were in civilian clothing, the detectives then called for a marked police unit, with one officer arriving first and then "[e]ventually" a second officer arriving some time thereafter. One of the officers climbed through the window to let the rest of the officers inside the residence.

Recollections as to what the detectives observed at this point diverge. According to Detective Noodwang, upon entering the residence, they found a locked bedroom door. After "knocking on it, beating on it, [and] yelling for him" without response, the officers "made a decision to get the door open," observing upon doing so Mr. Ford "laying [sic] on the bed, unconscious, gurgling from his mouth, [and] foaming from his mouth." Detective Noodwang recalled "[a] strong odor of bleach" and "a glass on the floor with some bleach still in it," as well as "a wash rag next to . . . his face on the bed." While Detective Noodwang recalled encountering Mr. Ford on a bed, Detective Aspinall recounted that when the officers entered the house, they observed Mr. Ford lying down on a sofa. Detective Aspinall explained that Mr. Ford "didn't look good" and "wasn't really able to converse much or anything." Both officers agreed that 911 was called after Mr. Ford was found. After calling 911, Detective Noodwang "pointed out" an empty cold and flu container in the bathroom wastebasket and an empty Tylenol PM container, both of which were collected by a different officer. Detective Noodwang collected a hairbrush as part of the missing person investigation.

Mr. Ford filed a motion to suppress the evidence and statements obtained from the search, seeking to exclude a "white hairbrush with

6

hair; glass of bleach, rag/towel soaked in bleach/chlorine on bed, smells observed within [Mr. Ford's] home; observations of [Mr. Ford's] demeanor and state, observations of empty medication boxes/bottles; and any and all statements made by [Mr. Ford] subsequent to the illegal search without a warrant." Relying primarily on *Seibert v. State*, 923 So. 2d 460 (Fla. 2006), the State argued that the law enforcement officers who entered Mr. Ford's residence without a warrant were faced with exigent circumstances and acted under the feared medical emergency exigency, having had an objectively reasonable belief at the time they entered the home that Mr. Ford was planning to harm himself. The State pointed to the handwritten letter in which Mr. Ford stated that he wanted to be with the victim if she was dead, along with concerning observations of Mr. Ford's demeanor during the December 22 interview. The State also noted the stark change in Mr. Ford's responsiveness when the detectives went to his home on the 24th, which "raised the concern that there was something more serious inside" the residence, contrasting his previous willingness to cooperate with his ostensible unwillingness to even respond to officers on the day of the search:

> [Mr. Ford's] overall communication with them had been very cooperative up until that point. He had consented to a search on the 20th. He had given an interview on the 20th. He consented to a search on the 22nd. He'd given an interview on the 22nd. Every request that had been made at that point had been granted by [Mr. Ford].

The State's characterization of Mr. Ford's behavior up until the 24th as "cooperative" reflected the testimony of both detectives. When asked whether, upon first meeting with Mr. Ford, he was "cooperative as far as . . . questioning him of things involving the investigation," Detective Aspinall responded in the affirmative. Similarly, Detective Noodwang

testified that all the way up to his visit with Mr. Ford and the victim's daughter on the 23rd, "[h]e was being very cooperative with us."

The trial court granted the motion to suppress. Although the order granting the motion is sparse, the trial court explained its reasoning in a lengthy verbal ruling which appears in the transcript of the hearing. The court noted that Detective Aspinall's testimony "rel[ied] substantially on his notes and reports as opposed to his independent recollection," which "affect[ed] the amount of weight" given to his testimony. The court pointed to discrepancies between Detective Noodwang's and Detective Aspinall's recollections as to the condition in which Mr. Ford was found on the 24th, Detective Aspinall having "said nothing about kicking a bedroom door open," and Detective Aspinall being unable to recall if Detective Noodwang was present for the search. The court found that "the collection of the hairbrush . . . does really militate in favor of [Mr. Ford's] argument," as the hairbrush had "absolutely zero to do with the exigent circumstances"—that is, the feared suicidality of Mr. Ford. It was observed by the court that neither detective offered testimony "that they ever looked in the windows or that they tried to look in the windows to see if they could see anything" prior to entering the home, and that this failure to adhere to "the least intrusive means" was "a really important fact." While the court gave "very little weight to what the officers doing the surveillance, the information they conveyed to Aspinall and Noodwang,"[1] the court credited the testimony that Detective Aspinall and

---

[1] The court explained its concern that the members of the surveillance team had not been called to testify and that the State had not adduced any testimony regarding "the nature and extent of the surveillance." The court noted that no testimony was presented as to "how many doors there were" or whether there "were . . . windows that they weren't watching that [Mr. Ford] could have snuck out of," which

8

Detective Noodwang "relied on those surveillance detectives in reaching this conclusion that [Mr. Ford] was in the home." The court explicitly stated that it "d[idn]'t find Det. Aspinall not credible" and that Detective Noodwang's "chronological recitation of facts and events was significantly more clear than Det. Aspinall's." However, the court expressed dubiousness as to the detectives' belief that Mr. Ford was suicidal, noting that the search occurred on December 24, and "on the 23rd, Noodwang said there was no indication he was suicidal." The court remarked that the officers did not call 911 upon their arrival, nor did they kick the door down or break a window to enter and provide immediate assistance. Rather,

> [t]he solution was, let's call dispatch to have a sergeant or a uniformed officer show up. Not with lights and sirens, just regular. Let's wait for them to get here. Now let's go around and find an open window[,] not kick the door in, not break a window—let's go find an open window. Let the smallest guy climb in, then come open the door. Not, go find him and where is he and is everything okay? No, go open the door and then we all go in. So I think the actions belie the stated reason.

Reflecting that the officers "had plenty of time to get a search warrant" and indicating that it "d[id]n't buy at all the argument that there were exigent circumstances that necessitated them going in [Mr. Ford's] home on December 24th of 1996," the court found that the officers entered the home based "[a]t most" on "a gut feeling they had, not based on any particular facts, or any facts that they may have had, that there was an alleged suicide note and statements on 12-22 going into 12-23." The court found that Detective Noodwang's "observations on the 23rd that there was [sic] no suicidal ideations at all" mitigated the

---

were cited as concerns that went towards "the completeness of their surveillance."

9

suicidal ideation expressed in the letter and in the statements Mr. Ford made on the 22nd. The court observed that Mr. Ford's statement "that murderers should die" and "if [the victim's] dead, I want to be with her" were accompanied by Mr. Ford "steadfastly and explicitly sa[ying], but she's not dead." And trial court again noted that the officers "waited" for their fellow law enforcement officers "to show up, and then they took the time to decide who was going to go in the residence"—a choice, the trial court reasoned, "that certainly does not support exigency."

## Discussion

"In reviewing a trial court's ruling on a suppression motion, this Court conducts a two-step analysis in which we determine whether (1) competent, substantial evidence supports the trial court's findings of historical fact; and (2) the trial court reached the correct legal conclusion." *Cruz v. State*, 320 So. 3d 695, 712 (Fla. 2021) (quoting *Jackson v. State*, 18 So. 3d 1016, 1027 (Fla. 2009)). "Because a trial court's ruling on a motion to suppress is a mixed question of law and fact, we defer to the trial court on the factual issues but consider the constitutional issues de novo." *Seibert*, 923 So. 2d at 468 (citing *Fitzpatrick v. State*, 900 So. 2d 495, 510 (Fla. 2005)).

Unreasonable searches and seizures are prohibited by both the Fourth Amendment to the United States Constitution and the Florida Constitution. Amend. IV, U.S. Const.; Art. I, § 12, Fla. Const. "Absent a warrant issued by a neutral and detached magistrate, a search is per se unreasonable." *Perez v. State*, 269 So. 3d 574, 577 (Fla. 2d DCA 2018) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). There are, however, exceptions to the warrant requirement, one of which is the existence of exigent circumstances. *State v. Markus*, 211 So. 3d 894, 906 (Fla. 2017) ("The burden is on the State to demonstrate that an

10

exigent circumstance existed to justify the warrantless search." (citing *Riggs v. State*, 918 So. 2d 274, 278 (Fla. 2005))). "[T]he emergency aid exception, whereby an officer enters a home to render emergency assistance to an occupant who is seriously injured or for whom serious injury is imminent" is one such exigent circumstance. *Id.* As the State correctly observes, "if the police enter a home under exigent circumstances and, prior to making a determination that the exigency no longer exists, find contraband in plain view, they may lawfully seize the illegal items." *Seibert*, 923 So. 2d at 470 (quoting *Davis v. State*, 834 So. 2d 322, 327 (Fla. 5th DCA 2003). "[A] warrantless seizure of evidence found in plain view is admissible if at the time of the search: (1) the seizing officer was legitimately in a place where the object could be plainly viewed; (2) the incriminating nature of the seized object was immediately apparent to the police officer; and (3) the seizing officer had a lawful right of access to the object itself." *Rimmer v. State*, 825 So. 2d 304, 313 (Fla. 2002) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

On appeal, Mr. Ford argues that competent substantial evidence supports the trial court's finding that exigency did not justify warrantless entry, and a trial court's factual findings "come[] to the reviewing court clad in a presumption of correctness." *See State v. Glatzmayer*, 789 So. 2d 297, 301 (Fla. 2001). His argument misses a critical distinction between questions of *fact* and questions of *law*. Although Mr. Ford notes—correctly—that "[a]ppellate courts cannot use their review powers in such cases as a mechanism for reevaluating conflicting testimony and exerting covert control over the factual findings," *see id.*, his argument misidentifies as a factual question an inquiry that is actually a *legal* question—that is, whether the officers' belief that a sufficient exigency

11

existed was objectively reasonable. In other words, the question of whether or not the relevant facts confronted by the officers—which are not in dispute—justified the warrantless entry is not a question of fact but a question of law. Because the pertinent facts were undisputed, the question that was before the trial court—and that is now before this court—was whether the officers who entered Mr. Ford's home reasonably believed a medical emergency was occurring sufficient to justify the exigent circumstances permitting their warrantless entry. *See Riggs*, 918 So. 2d at 281 ("[A]uthorities may enter a private dwelling based on a reasonable fear of a medical emergency."); *Everett v. State*, 893 So. 2d 1278, 1283 (Fla. 2004) ("The pertinent facts are undisputed; thus, we review de novo the constitutional issue raised."). This question of reasonable belief is a *legal* question, not a question of fact, and—contrary to the conclusion reached by the majority—it is well within an appellate court's scope of review. Appellate courts routinely review de novo the application of the facts adduced at a suppression hearing to the legal question of whether an officer's perception of the existence of exigent circumstances was objectively reasonable and whether those circumstances justified a warrantless entry. *See, e.g., Turner v. State*, 645 So. 2d 444, 447 (Fla. 1994) (finding not only that that the officers' warrantless entry into the defendant's motel room was consensual, but also that the warrantless entry was "an emergency" when the officers observed that the defendant, after leaving the door ajar, "walked from the door to a bed, pulled a gun, and pointed it at his head," and "[a]n officer testified that he was afraid [the defendant] would kill himself"); *Bauman v. State*, 290 So. 3d 147, 150 (Fla. 2d DCA 2020) (reversing the denial of a motion to suppress evidence following a vehicle search when the officer conducted the search "without observing anything that would have

supported a reasonable suspicion of criminal activity or of a need to assist someone experiencing a medical emergency"); *Lapace v. State*, 257 So. 3d 588, 596 (Fla. 2d DCA 2018) (assessing whether it was "objectively reasonable for the deputies to believe that there was an ongoing or imminent emergency that required their immediate attention" sufficient to justify warrantless entry into a residence, and finding that "[t]he trial court's conclusion that the deputies' entry into the residence was lawful was error"); *Wheeler v. State*, 956 So. 2d 517, 520 (Fla. 2d DCA 2007) (reviewing an order denying a motion to suppress to assess "whether these facts provided the deputies with a reasonable basis to believe that an emergency existed that justified their warrantless entry into [the defendant's] residence"); *Vitale v. State*, 946 So. 2d 1220, 1221 (Fla. 4th DCA 2007) ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." (quoting *Mincey v. Arizona,* 437 U.S. 385, 392–93 (1978))).

Here, the trial court did not discredit the officers' testimony about the pertinent facts underpinning the officers' professed motivation to enter the home without a warrant. The court found the testimony of both detectives credible, and noted that "[t]he essential facts on the 24th—obviously, they match up pretty well . . . ." Rather, the trial court found that these facts were not enough to support exigency:

> I find that there's quite frankly no evidence of any exigencies. At most, it was a gut feeling they had, not based on any particular facts, or any facts that they may have had, that there was an alleged suicide note and statements on 12-22 going into 12-23. But then that was ameliorated by Noodwang's observations on the 23rd that there was no suicidal ideations at all.

In other words, the trial court did not find the officers' attribution of the search to a concern for Mr. Ford's wellbeing to have been pretextual.

13

Indeed, Mr. Ford had already consented to multiple searches of his residence prior to the 24th, and thus, as the State pointed out in its brief, "there was no need for the detectives to try to circumvent the warrant requirement at that point."

The trial court assessed the undisputed evidence and reached the conclusion that the facts available to the officers did not give rise to a reasonable concern for the suspect's safety justifying the exigent circumstances exception to the warrant requirement. The trial court's conclusion was that the officers only had a "gut feeling . . . , not based on any particular facts," and that it "just d[id]n't believe that there was anything more than a hunch or a guess or a speculation." In light of the objective test that must be applied to the Fourth Amendment analysis, the court's determination that the facts did not support a reasonable belief that exigent circumstances existed and only amounted to a "gut feeling" is a legal conclusion—a conclusion that the officers' sincerely held belief that exigent circumstances existed was not objectively reasonable. *See State v. M.B.W.*, 276 So. 3d 501, 511 (Fla. 2d DCA 2019) ("The measure of reasonableness is totality of the circumstances. . . . Against this objective metric, the State's exigent circumstances argument fails." (citations omitted) (first citing *Wright v. State*, 1 So. 3d 409, 412 (Fla. 2d DCA 2009); and then citing *State v. Boyd*, 615 So. 2d 786, 789 (Fla. 2d DCA 1993))); *Boyd*, 615 So. 2d at 789 ("[T]o allow a warrantless entry into a person's home in an emergency situation, there must be objectively reasonable circumstances that convey to the police officer an articulable, reasonable belief that an emergency exists."); *cf. Turner*, 645 So. 2d at 447 ("This was such an emergency, so the officers did not err in entering [the defendant's] motel room."); *Lapace*, 257 So. 3d at 596

14

("There was no objective basis for the deputies to fear for anyone's safety.").

Echoing the court's findings, Mr. Ford argues on appeal that the officers who entered the home had "a hunch, but not enough to justify a search of the home." But determining whether or not the officers were operating on "a hunch" is *not*, as Mr. Ford claims, "a factual decision." As with the question of whether reasonable suspicion existed in the first place, the difference between a *hunch* and a *reasonable suspicion* is a legal issue reviewable by an appellate court. *See, e.g.*, *Allenbrand v. State*, 283 So. 3d 969, 971 (Fla. 2d DCA 2019) ("To avoid a violation of an individual's Fourth Amendment rights, the suspicion of criminal activity must be well-founded and articulable. An unparticularized or bare suspicion or a hunch is insufficient." (citations omitted) (first citing *Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993); then citing *State v. Teamer*, 151 So. 3d 421, 426 (Fla. 2014); and then citing *Love v. State*, 706 So. 2d 923, 924 (Fla. 2d DCA 1998))); *Vasquez v. State*, 870 So. 2d 26, 31 (Fla. 2d DCA 2003) ("Even if a [*Maryland v.*] *Buie*[, 494 U.S. 325 (1990),] standard applied to provide 'exigent circumstances' to enter a residence that the officers have no other lawful basis to enter, that standard would require the officers to have articulable facts, not a mere hunch, that would warrant a reasonable belief that the rooms they intended to search harbored a dangerous individual posing a threat to those on the arrest scene. (citing *Newton v. State*, 378 So. 2d 297, 299 (Fla. 4th DCA 1979))); *Price v. State*, 120 So. 3d 198, 200 (Fla. 5th DCA 2013) (finding that "inchoate . . . and unparticularized suspicions or hunches will not suffice" to show reasonable suspicion for an investigatory stop (quoting *United States v. Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013))). On this question, the

15

pertinent facts are not in dispute, and thus we review the application of these facts to the question of law de novo. *See Everett*, 893 So. 2d at 1283 ("The pertinent facts are undisputed; thus, we review de novo the constitutional issue raised."). As a matter of law, the motion to suppress should have been denied.

## I.    Exigent Circumstances Justified Warrantless Entry

"Whether sufficient exigent circumstances exist is evaluated based on the totality of the circumstances." *Seibert*, 923 So. 2d at 468 (citing *Zeigler v. State*, 402 So. 2d 365, 371 (Fla. 1981)). To justify the feared medical emergency exigency exception, "the police must have an objectively reasonable fear that a medical emergency is occurring inside the residence." *State v. Fultz*, 189 So. 3d 155, 159 (Fla. 2d DCA 2016) (citing *Riggs*, 918 So. 2d at 281). Here, the totality of the circumstances presented to the detectives—including the appreciable change in Mr. Ford's responsiveness and articulable evidence of suicidal ideation—supported an objectively reasonable belief that Mr. Ford was at risk of self-harm. It is undisputed that Mr. Ford had been consistently cooperative, consenting to multiple searches of his home and lengthy interviews with the detectives, and yet on December 24 he failed to respond to the detectives banging on his door and windows—an abrupt, unexplained change in his responsiveness and willingness to cooperate. Both detectives also testified to being concerned about Mr. Ford's welfare because of his demeanor during previous encounters. Additionally, Mr. Ford admitted to authoring a letter wherein he stated that if the victim was dead, he wanted to be with her. Although the court observed that Mr. Ford's statements "that murderers should die" and "if [the victim's] dead, I want to be with her" were accompanied by Mr. Ford "steadfastly and explicitly sa[ying], but she's not dead"—apparently suggesting that

16

Mr. Ford's insistence that the victim was not dead negated the suicidal ideation present in the statement "if [the victim's] dead, I want to be with her"—this interpretation ignores the reasonable possibility that Mr. Ford was simply reserving the option to deny any involvement in the victim's disappearance. That is, it would make no sense to admit to the detectives that the victim was dead when, as Detective Aspinall testified, the detectives "didn't know" whether the victim was still alive during the December 22 interview.

The facts are undisputed. Thus, the question before this court— the *legal* question—is whether Mr. Ford's Fourth Amendment rights were implicated by this warrantless search. *See Wyche v. State*, 987 So. 2d 23, 25 (Fla. 2008) ("The standard of review for motions to suppress is that the appellate court affords a presumption of correctness to a trial courts findings of fact but reviews de novo the mixed questions of law and fact that arise in the application of the historical facts to the protections of the Fourth Amendment." (citing *Fitzpatrick*, 900 So. 2d at 510)). Because the foregoing undisputed facts demonstrate that an "objectively reasonable basis exist[ed] for the [police] to believe that there [was] an immediate need for police assistance for the protection of life," *see Vanslyke v. State*, 936 So. 2d 1218, 1222 (Fla. 2d DCA 2006) (quoting *Seibert*, 923 So. 2d at 468), the officers' warrantless search was justified by exigent circumstances. *Cf. Fultz*, 189 So. 3d at 160 ("There was nothing that could have led the officers to form an objectively reasonable belief that there was an ongoing medical emergency in the residence that required their immediate assistance.").

It is apparent from the hearing transcript that the trial court misapplied the undisputed facts to the law governing searches and seizures, incorrectly concluding that Detective Noodwang's belief on

December 24 that Mr. Ford was suicidal was objectively unreasonable merely because Detective Noodwang had been dubious of the suspect's suicidality on the 23rd.  First, it was not Detective Noodwang who initiated contact at Mr. Ford's residence on December 24—it was Detective Aspinall, alongside Detective Babb.  Detective Aspinall testified that he went to Mr. Ford's residence in part to "see how he was," following the six-and-a-half interview on the 22nd that concluded in the "early morning hours of the 23rd" when Mr. Ford was dropped off.  That is, the last time Detective Aspinall had seen Mr. Ford had been when Mr. Ford was dropped off on the 23rd, "and his demeanor was not good when we dropped him off."  Moreover, it was reasonable that Detective Noodwang's perception of the degree of danger changed based on new information, having vacillated from a professed concern of potential suicide on the 22nd to skepticism on the 23rd to reignited concern on the 24th.  An assessment of whether the circumstances justified the development of the officers' nascent concerns in previous encounters to a significant fear of an ongoing emergency based on the circumstances of their December 24 home visit compelling a warrantless entry is, again, a legal determination reviewed de novo.  *See Hargrove v. State*, 412 So. 3d 817, 821 (Fla. 6th DCA 2024) ("[W]e review 'de novo the mixed questions of law and fact that arise in the application of the historical facts to the protections of the Fourth Amendment.'  In this case, the pertinent facts are undisputed.  Thus, our review is purely de novo." (citations omitted) (first citing *Wyche*, 987 So. 2d at 25; then citing *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001); and then citing *Everett*, 893 So. 2d at 1283))).

In light of the undisputed facts, it was objectively reasonable for the officers to believe that there were exigent circumstances indicating a possibility that the suspect might be committing or contemplating

18

suicide on the 24th based on new evidence that had not yet developed on the 23rd when one of those same officers had been skeptical that Mr. Ford's suicidal ideation was sincere. It was objectively reasonable for the officers to have concluded that the marked change in the suspect's willingness to cooperate cast the suicidal ideations he manifested in previous encounters in a new light. It was objectively reasonable for the officers to reconsider the suspect's behavior they had observed in the past and change their opinion about what it portended upon their encountering new indicia that shed further light on Mr. Ford's mindset. When Mr. Ford did not respond on the 24th after having been nothing but cooperative theretofore, it was objectively reasonable for the officers to suspect that he had been sincere all along when he manifested a desire to end his own life. *See Seibert*, 923 So. 2d at 468 ("Whether sufficient exigent circumstances exist is evaluated based on the totality of the circumstances." (citing *Zeigler*, 402 So. 2d at 371)).

Because the officers' warrantless entry was supported by exigent circumstances, the subsequent seizure of incriminating evidence found in plain view—the "white hairbrush with hair; glass of bleach, rag/towel soaked in bleach/chlorine on bed"—was admissible. *See Rimmer*, 825 So. 2d at 313 (citing *Horton*, 496 U.S. at 136–37); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (first citing *Horton*, 496 U.S. at 136–37; and then citing *Texas v. Brown*, 460 U.S. 730, 739 (1983))). While probable cause to enter Mr. Ford's home was obviated by the existence of the medical emergency, probable cause of criminal activity was necessary in order for the detectives to actually seize the

19

evidence in plain view. *See Rimmer*, 825 So. 2d at 313 ("[S]eizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." (quoting *Texas*, 460 U.S. at 741–42)). Here, the sworn affidavit of Detective Charles Butler, filed in 2024, indicates that the officers who entered Mr. Ford's residence on December 24, 1996, had information available to them supporting a finding of probable cause that the seized items were linked to the disappearance of the victim. Statements by the victim's daughter concerning Mr. Ford's "suspicious" explanation of the victim's disappearance; the victim's neighbor's observations that she had not seen the victim's car parked at her residence since Sunday, December 8, which contradicted Mr. Ford's statements that the victim had left on Monday, December 9; and Mr. Ford's rental of a storage unit containing the victim's effects—rented the same date the victim had gone missing—all serve as indica supporting a finding of probable cause that Mr. Ford was responsible for the victim's disappearance. The incriminating character of a hairbrush that could have belonged to the subject of a missing person investigation is readily apparent. Likewise, the glass of bleach used by a suspect in a missing person case to attempt suicide and a "rag/towel soaked in bleach/chlorine" are suggestive of suicidal ideation, which is suggestive of guilt, especially in light of Mr. Ford's comments that he wanted to be with the victim *if she was dead* and that if he killed her, he should be dead as well. Alternatively, Mr. Ford could have been attempting to sicken himself sufficiently enough to be hospitalized and evade continued police questioning, and thus this evidence would be suggestive of effective flight indicative of guilt. *See State v. Rodriguez Lopez*, 378 So. 3d 691, 697 (Fla. 2d DCA 2024)

20

("Probable cause is a practical, common-sense question. It is the probability of criminal activity, and not a prima facie showing of such activity, which is the standard of probable cause." (quoting *Polk v. Williams*, 565 So. 2d 1387, 1390 (Fla. 5th DCA 1990))).

## II. The Trial Court's Focus on Immaterial Discrepancies and Subjective Motivation was Erroneous

In granting Mr. Ford's motion to suppress, the record reflects that the trial court misplaced its focus on immaterial discrepancies between Detective Noodwang's and Detective Aspinall's testimony. The court observed that "[t]he essential facts on the 24th—obviously, they match up pretty well, except for the fact where Aspinall says he doesn't recall Noodwang being there or if he even showed up, where Noodwang says he was there and was present for the entire event." However, the trial court also noted "some pretty significant factual differences" between the officers' recollections of where in Mr. Ford's home he was found and the specifics of Mr. Ford's physical condition following his attempted suicide. Again, it is important to note that the trial court did not discredit the officers' testimony based on these discrepancies, instead affirmatively stating that it "d[id]n't find the detectives that testified today to be not credible or incredible."

Discrepancies in whether or not the door was kicked open, where in the home Mr. Ford was found, Mr. Ford's condition when he was found, and whether Detective Noodwang was present are irrelevant to the factual findings that supported the search. Aside from Detective Aspinall being unable to recall whether Detective Noodwang was present—which is itself irrelevant to the issue of exigent circumstances—the discrepancies observed by the court occurred *after* the detectives entered the residence. But what matters is whether there was an objectively

21

reasonable basis for warrantless entry at the time the officers *entered* the home.  *See Seibert*, 923 So. 2d at 468 ("It is immaterial whether an actual emergency existed in the residence; only the reasonableness of the officer's belief at the time of entry is considered on review." (citing *Boyd*, 615 So. 2d at 789)).  These discrepancies, then, are immaterial, having no bearing on what the officers knew before entering the residence or their thought process in determining that entry was necessary.  Furthermore, they are obviously not of a nature that would lead a factfinder to conclude that there was no danger of suicide.  Notably, when the officers entered the residence, they did indeed discover evidence that Mr. Ford had attempted suicide.  However, a court should "not look to events that occurred after the search" "[i]n determining whether" the search was justified.  *See United States v. Peake-Wright*, 126 F.4th 432, 439 (6th Cir. 2025) (quoting *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007)).  Only what was known to the officers *before* they made the warrantless entry into the home is relevant to the question of whether the search was constitutional.

The trial court's decision was also premised upon an erroneous focus on the *motive* of the officers in returning to the residence and performing the warrantless search.  "Whether a warrantless search is justified by such an emergency does not turn on the 'subjective motivation' of the police."  *Vanslyke*, 936 So. 2d at 1222 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 398 (2006)).  "[P]olice may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests."  *Seibert*, 923 So. 2d at 468 (citing *Rolling v. State*, 695 So. 2d 278, 293–94 (Fla. 1997)).  Whether or not the officers were at the home to conduct a search is

22

irrelevant; whatever motive they had in traveling to the home would not invalidate an objectively reasonable belief that a serious medical emergency was occurring once they arrived. The court's focus on "the collection of the hairbrush after all of this has happened" as a factor that "really militate[s] in favor of [Mr. Ford's] argument"—suggesting, perhaps, that collecting the hairbrush was indicative of the officers having arrived with an intent to search—is immaterial to the question of the officers' reasonable belief of a medical emergency when they entered the home. Both detectives testified that after travelling to the home to continue questioning Mr. Ford, they decided to enter the residence "to make sure everything was all right" or to "get inside that house to check on him" based on a concern for his safety that developed once the officers were actually present at the home and faced with Mr. Ford's inexplicable unresponsiveness in light of his past suicidal ideation. Thus, regardless of whether they had actually *arrived* with the intent to search, they did not *enter* with the intent to search. And it is *entry* with the intent to search that matters, as doing so would have rendered the search violative of the Fourth Amendment even despite the objective reasonable belief that there were exigent circumstances indicating a possible medical emergency requiring immediate attention. *Cf. Fultz*, 189 So. 3d at 159 ("The feared medical emergency exception 'permits police to enter and investigate private premises to preserve life . . . or render first aid, *provided they do not enter with an accompanying intent either to arrest or search.*' " (emphasis added) (quoting *Riggs*, 918 So. 2d at 280)).

Similarly, the court's rationale that the officers failed to use the least intrusive means to ascertain whether a medical emergency was occurring was irrelevant to the question of whether there were exigent circumstances sufficient to justify the search under the Fourth

23

Amendment. The court reasoned that the detectives' testimony regarding "banging on the door" and "banging very loudly on the doors and windows" evidenced a failure to use "the least intrusive means" because the court "heard no evidence of it from either detective, that they ever looked in the windows or that they tried to look in the windows to see if they could see anything." The presumption that officers banging on windows through which they could possibly observe what was going on inside nonetheless did not bother to peer through them is highly speculative and much less likely than a presumption that they would have taken advantage of the ability to see inside the home. There was no testimony that they *did not* look into the windows. And it would defy logic to presume that an officer hitting a window would not also be looking *at* the window rather than averting his gaze.

Moreover, the court's importation of a least intrusive means test into the ultimate legal question of whether exigent circumstances justified the warrantless search constitutes a misapplication of the actual standard for such inquiry, which does not include such a component. *See Boyd*, 615 So. 2d at 789 ("[T]o allow a warrantless entry into a person's home in an emergency situation, there must be objectively reasonable circumstances that convey to the police officer an articulable, reasonable belief that an emergency exists."). Similarly, the trial court's scrutinization of the timing and method of the officers' physical entry of the home layered an inapposite analysis onto the review of whether the decision to enter was itself based on an objectively reasonable perception of exigent circumstances. Despite explicitly finding that the officers did not lack credibility, the court's analysis nonetheless second-guessed the officers' strategy and tactical choices—a topic that was immaterial the Fourth Amendment analysis in this case.

24

As to the officers' tactical decision to wait for backup before entry suggesting a lack of exigency, the detectives testified that they had called for uniformed backup because they were "wearing civilian clothes and didn't want to get shot." It is an eminently reasonable possibility that a situation can be urgent enough for law enforcement to enter a structure and yet include circumstances that require considerations about the safety of officers and first responders—precisely the scenario faced by the detectives at Mr. Ford's residence. There is no requirement in an exigency analysis that law enforcement utilize the "least intrusive means" in order to comply with the Fourth Amendment's prohibition on unreasonable searches and seizures, and there is no requirement that officers unduly *risk their lives* by forcibly entering a residence occupied by a suspect in a missing person case who is at risk of suicidal behavior in order to demonstrate urgency as a matter of law. The trial court questioned the officers' decision to await backup support from uniformed officers. But it is inconsistent with common sense to categorically exclude the possibility that officers might reasonably to choose to incur *some* delay in order to mitigate the risk that non-uniformed officers might be subject to violence when entering the residence of a suspect whom they at that point believed to be in emotional distress and potentially suicidal—and possibly *homicidal*, given the suspicion that he had something to do with the victim's disappearance.

Again, the court made a specific finding on the record that the officers' testimony *was credible.* Having explicitly credited the testimony of the officers, the sincerity of their belief that Mr. Ford was possibly suicidal when they entered the home is a matter of record. While not categorically foreclosing the possibility that safety precautions taken by police officers in performing their inherently hazardous duties might

under some circumstances be relevant to a Fourth Amendment analysis, they are not pertinent in this case, in which the sole inquiry is whether the officers' expressed motivation to enter the home to ensure the suspect's safety was based on an objectively reasonable belief that his safety might be in jeopardy. It has been said that caution is the better part of valor, and in this case, second-guessing the officers' tactical balancing of officer safety against the urgency of the situation does not advance the goal of determining whether their belief that a warrantless entry was necessary to address a potential medical emergency was objectively reasonable. *See, e.g., Presley v. State*, 227 So. 3d 95, 99 (Fla. 2017) ("We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' " (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977))).

The question before the trial court in ruling on the motion to suppress was to assess from the evidence whether the officers had a sincere belief that there was a medical emergency giving rise to exigent circumstances motivating their warrantless entry and whether, as a matter of law, that belief was objectively reasonable. *See Boyd*, 615 So. 2d at 789 ("[T]o allow a warrantless entry into a person's home in an emergency situation, there must be objectively reasonable circumstances that convey to the police officer an articulable, reasonable belief that an emergency exists."). Here, the fact that the officers delayed until other uniformed officers arrived in order to better ensure the safety of the officers as they forcibly entered the home, as a matter of law, does not render the sincerely held belief that exigent circumstances existed objectively unreasonable.

26

## **Conclusion**

The relevant record evidence supports a finding that the officers were operating under the objectively reasonable belief that a welfare check was necessary given the appreciable change in Mr. Ford's responsiveness and in light of the indica of potential suicidality in his comments and his letter, and thus the warrantless search was justifiable. *Cf. Fultz*, 189 So. 3d at 159 (citing *Riggs*, 918 So. 2d at 281). As a matter of law, the motion to suppress should have been denied.

_____

Opinion subject to revision prior to official publication.